**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MERION KANE,<br><br>Plaintiff,<br><br>v.<br><br>GOODLEAP, LLC, *et al.*,<br><br>Defendants. | Case No. 22-cv-3777 (JMC)<br><br>** FILED UNDER SEAL ** |

**MEMORANDUM OPINION & ORDER**

Merion Kane's adult daughter agreed to purchase solar panels for her mother's home and agreed to fund that purchase via a loan. The daughter signed Kane's name on contracts for both the solar panels and loan. When Kane found out about the loan, she tried to rescind both contracts and demanded that the loan come off her credit report. She also filed this lawsuit. She sued the company providing the solar panels—Standard Energy Solutions LLC—and the lender—GoodLeap, LLC—along with the company whose salesperson sold the system and the credit reporting agencies. She alleged violations of the Fair Credit Reporting Act, Truth in Lending Act, D.C. Consumer Protection Procedures Act, and common law claims for fraudulent concealment and negligence.

The only defendants left in the case are Standard Energy and GoodLeap. Both companies filed motions for summary judgment, and Kane filed a partial cross-motion for summary judgment. Because Kane is entitled to summary judgment on one of her Fair Credit Reporting Act claims against GoodLeap, the Court grants her motion in part. And although GoodLeap is entitled to judgment as a matter of law on the Consumer Protection Procedures Act claim, the Court is not yet in a position to decide whether one aspect of that claim can proceed against Standard Energy.

If Kane wishes to proceed with that claim, she must file a supplemental brief explaining why she has standing to press it. Aside from those two claims—the Fair Credit Report Act claim against GoodLeap and the Consumer Protection Procedures Act claim against Standard Energy—Kane's claims fail on the undisputed facts. The Court therefore grants in part and denies in part each of the motions for summary judgment.[1]

## I. BACKGROUND

Because the parties filed cross-motions for summary judgment, the Court recounts here only the facts that are not in dispute. Any genuinely disputed facts are addressed where relevant in the Court's analysis.[2]

### A. Factual Background

Merion Kane owns her home in the District of Columbia. *See* ECF 86-3 at 6. Kane is now in her 90s and has limited mobility since she suffered multiple strokes in late 2019. *See id.* at 4. Because of the strokes, Kane needs "constant care." *Id.* at 5. She has help from a caregiver, and her adult children come to stay with her from "time-to-time" to help, as well. *Id.*

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion and order, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

[2] The Court's task in identifying the disputed and undisputed facts was made more difficult by the parties' failure to follow Local Civil Rule 7(h)(1). GoodLeap did not file as an "accompani[ment]" to its motion for summary judgment the required "statement of material facts as to which [it] contends there is no genuine issue." LCvR 7(h)(1). Kane did include that statement in her motion, *see* ECF 101 at 2–8, but failed to respond to Standard Energy's statement of material facts by identifying which of those statements Kane thought were disputed and therefore needed "to be litigated," LCvR 7(h)(1). And Standard Energy and GoodLeap both failed to include in their oppositions to Kane's motion for summary judgment a "concise statement" identifying which of the facts from Kane's "statement of material facts" the companies thought were "genuine[ly]" disputed. *Id.*; ECF 101 at 2; *see* ECF 103; ECF 104. Counsel is admonished to follow the local rules in future cases. Nevertheless, the Court will "excuse" each party's "noncompliance with Rule 7(h)" here. *Bush v. District of Columbia*, 595 F.3d 384, 387 (D.C. Cir. 2010). No party objected to the other's failure to follow the rule, and the arguments each party made in its motion and opposition were "enough to place" the other side "on notice of what they had to present in order to defeat" the "motion." *Id.* In deciding what facts were and were not in dispute, the Court relied on the "cited materials" in the parties' briefing, Fed. R. Civ. P. 56(c)(3), and did not take on the responsibility of "hunting for truffles buried in the record," *Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024).

While Kane's daughter—Phyllis—was staying with Kane in the spring of 2021, a salesperson knocked on Kane's door. *See* ECF 86-4 at 9; ECF 95-2 ¶ 2. The salesperson worked for National Solar Energy Corporation and was selling home solar panel systems. *See* ECF 86-4 at 9; ECF 95-2 ¶¶ 2–4. Phyllis sat with the salesperson at her mom's dining room table, and he pitched her on the purported benefits of installing solar panels. *See* ECF 86-4 at 10–11. In a declaration, Phyllis says the salesperson "initially" told her the "solar system . . . would be free to install." ECF 95-2 ¶ 5.[3] Kane was not present during this first meeting. *See* ECF 86-4 at 11.

After Phyllis expressed interest during that first meeting, the salesperson returned a few weeks later. *See* ECF 86-4 at 12. During that next visit, Phyllis told the salesperson that he "would have to speak to [her] mom" before "moving forward." *Id.* So the salesperson went into Kane's bedroom and—with Phyllis in the room—discussed "the benefits" of installing solar panels with Kane. *Id.* at 13. Kane says that the salesperson "offered to have free solar panels installed" and says that she "considered it but never agreed" to his offer. ECF 95-4 ¶¶ 4–5; *see also* ECF 85-2 at 138 (saying same in deposition); ECF 86-4 at 13 (Phyllis testifying that Kane "understood" the solar system to be "free" coming out of this meeting).[4]

[3] Invoking the "sham-affidavit rule," GoodLeap asks the Court to disregard this declaration. ECF 103 at 7–8. The Court need not decide at this stage whether to take that step, because this declaration makes no difference to the Court's resolution of the pending motions. The Court notes, however, that should Kane wish to proceed with the D.C. Consumer Protection Procedures Act claim related to Standard Energy's alleged misrepresentation about the price of the solar panels, *see infra* 11, 23 (discussing issues precluding resolution of that claim at this time), she may well need to explain why this affidavit does not qualify as a sham.

[4] Standard Energy protests that this testimony is inadmissible hearsay, *see* ECF 85-1 at 14, but it is not being offered to "prove the truth of the matter asserted," Fed. R. Evid. 801(c)(2). Kane's theory is that the solar panels were not, in fact, free. Rather than admitting this salesperson's out-of-court statement to prove the truth of the matter asserted, then, Kane is using it to prove "[t]he mere fact that" the allegedly false "statement was made." *United States v. Day*, 591 F.2d 861, 886 (D.C. Cir. 1978). That is not a hearsay purpose. *See Anderson v. United States*, 417 U.S. 211, 220 n.8 (1974) ("Of course, evidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement.").

Nevertheless, the salesperson came back to the house again, this time with a contract providing that a company called Standard Energy Solutions—one of the two defendants left in this case—would install solar panels at the home. *See* ECF 85-2 at 60–61 (first pages of agreement); ECF 86-4 at 15. The agreement said the price of the installed system was $49,941.40. *See* ECF 85-2 at 60.[5] Using a signature software, Phyllis then signed her mother's name to the agreement. *See* ECF 86-4 at 15–16; ECF 85-2 at 60–74. A representative from the sales company signed the agreement that same day and then sent it to Standard Energy, whose Chief Financial Officer countersigned two days later. *See* ECF 85-2 at 60; ECF 95-1 at 20–21 (explaining that the company responsible for originating sales forwards contracts to Standard Energy "[a]fter the consumer signs"); *id.* at 25 (identifying signatory as Chief Financial Officer).[6]

The contract that Phyllis signed on her mother's behalf included a financing requirement, under which the cost of installing the system would be funded by a company called LoanPal. *See* ECF 85-2 at 72. LoanPal later became GoodLeap—the other defendant left in the case—and the Court refers to the lender as GoodLeap from here. *See* ECF 86-4 at 16. Standard Energy and GoodLeap had agreed to work together to fund solar panel projects, with Standard Energy identifying customers and then encouraging them to use GoodLeap as a lender to fund the costs of installing the panels at their homes. *See* ECF 86-18 at 2–3.

---

[5] A later signed change order lowered the cost to $42,936.80. *See* ECF 85-2 at 75.

[6] Somewhat perplexingly, there is a second installation contract in the record that was signed by Kane (presumably by Phyllis on Kane's behalf) nine days after the first but was never countersigned by Standard Energy. *See* ECF 86-5 at 2. No party has explained the significance of this agreement, which appears to be identical to the earlier signed version. Standard Energy's corporate representative could not explain this second agreement at his deposition and said it was "not typical" for there to be two such agreements. ECF 95-1 at 24–25. In her deposition, Phyllis said that the salesperson came back to the house with "an amended" or "modified agreement" adding her to the contract, ECF 85-2 at 29, which would potentially be an explanation except for the fact that Phyllis is not listed on the later signed installation contract, *see* ECF 86-5 at 2. Because no party assigns any significance to the fact of this second agreement, the Court need not make heads-or-tails of it.

A few months after Phyllis signed the installation agreement on her mother's behalf, GoodLeap executed a loan agreement with Kane and Phyllis. *See* ECF 86-7 at 3. Kane was listed as the "[b]orrower" and Phyllis as a "[c]o-[b]orrower." *Id.* The agreement was sent to Kane and Phyllis for their respective signatures at two separate email addresses—for Kane, "pekan1432@gmail.com," and for Phyllis, "pmk1432@yahoo.com." ECF 86-8 at 2. But those email addresses both belonged to Phyllis. *See* ECF 86-4 at 23; *see also* ECF 86-3 at 9 (Kane identifying the "pekan1432@gmail.com" as Phyllis's email address). Phyllis testified that she gave these two email addresses—"pekan1432" for her mom and "pmk1432" for herself. ECF 95-3 at 36. After GoodLeap sent the loan agreement to these email addresses, it was signed. *See* ECF 86-8 at 2. One signature is for Kane, and the other for Phyllis. *See* ECF 86-7 at 3. Phyllis, however, admits that she was responsible for both signatures. *See* ECF 86-4 at 24. And Phyllis also admits that she did not "talk to her [mom] about the loan agreement." *Id.* at 18.

Meanwhile, Standard Energy obtained permits from the city to install the solar panels and conducted a site visit at the home—including inside the home—to prepare for installation. *See* ECF 85-2 at 78–103. And at some point during the summer of 2021, Standard Energy installed the solar panels. *See* ECF 86-3 at 10. Kane knew the panels were installed because she heard people working on her roof. *See id.* She says that she still did not know, however, that there was a loan taken out in her name to fund the cost of the solar panels. *See id.*; *see also* ECF 95-4 ¶ 6. Because of issues with the utility company, it would take more than half a year before the solar panel installation was complete and the system was ready for use. *See* ECF 86-13 at 5. All the while, payments were being made to GoodLeap for the loan, first for $179.76 per month and then, as provided in the loan agreement, $245.29 per month. *See* ECF 86-11 at 2; ECF 86-7 at 3 (loan

agreement). Those payments were coming out of Kane's bank account, but Kane says that she did not immediately notice that they were being made. *See* ECF 86-3 at 10–11.

Kane eventually did learn that a loan had been taken out in her name to fund the project. At some point she noticed the monthly transfers on her bank statement. *See* ECF 86-3 at 11. And in August 2022, she applied for a loan to pay her medical bills. *See* ECF 95-4 ¶¶ 9–10. Her loan application was denied because her "debt to income" ratio "was too high." *Id.* ¶ 10. That same month, Kane's son called GoodLeap to "complain" that Kane "did not sign the" loan agreement. ECF 87-2 at 4. After the son called, GoodLeap "began an investigation." ECF 101 at 6 (Kane's statement of facts); ECF 86-1 at 11 (GoodLeap saying same); *see also* ECF 87-2 at 4. As part of the investigation, GoodLeap called Phyllis and told her that Kane was claiming "that she did not agree or sign to the loan." ECF 86-15 at 2. Phyllis acknowledged on that call that she—Phyllis—"actually signed" the documents and that Kane may not have "fully underst[oo]d" what "was going" on. *Id.* Around this same time, Kane retained a lawyer. That lawyer sent letters to GoodLeap—two in September, and a third in November—requesting that GoodLeap "cease reporting the loan to the credit reporting agencies" and "release[] immediately" any lien that was placed on Kane's home. ECF 86-16 at 2, 4–5. In the November letter, the lawyer informed GoodLeap that Kane was "rescind[ing]" the loan agreement. *Id.* at 5.

Kane also began submitting disputes to the credit reporting agencies—Equifax, Experian, and TransUnion. *See* ECF 95-4 ¶ 16; ECF 95-5; ECF 95-6; ECF 95-7. Those agencies then notified GoodLeap that they had received these disputes from Kane. *See* ECF 87-3 at 4. GoodLeap received two such dispute notifications on October 19, 2022, another on October 28, 2022, and a fourth on February 24, 2023. *See id.*

Eventually, GoodLeap's internal investigation was wrapped up and processed through all the necessary layers of internal review. *See* ECF 87-2 at 8. In March 2023, the company decided to terminate Kane's loans. *See id.* The company then returned to Kane all of the payments that had been made. *See id.* at 9. That March, GoodLeap also reported back to the credit reporting agencies, closing the loop on the disputes those agencies had forwarded. *See* ECF 87-3 at 5.

**B. Procedural Background**

Months before GoodLeap terminated the loan and refunded the money, Kane filed this lawsuit. *See* ECF 1-3 at 16. She originally filed the case in the Superior Court of the District of Columbia, and she named as defendants GoodLeap, Standard Energy, National Solar Energy Corporation, and the credit reporting agencies Equifax, Experian, and TransUnion. *See id.* at 2. Kane alleged violations of the Fair Credit Reporting Act, Truth in Lending Act, and D.C. Consumer Protection Procedures Act, as well as a common law claim for fraudulent concealment. *See id.* at 10–15.

TransUnion removed the case to this Court and GoodLeap later filed a notice that it was joining in TransUnion's removal, while Standard Energy, GoodLeap, and the credit reporting agencies all proceeded to file answers in this Court. *See* ECF 1; ECF 5; ECF 9; ECF 11; ECF 15; ECF 16; ECF 18. Kane failed, however, to submit proof of service for National Solar Energy Corporation and, after the Court warned her that failure to prove service would result in that company's dismissal, it was dismissed as a party. *See* July 1, 2024 Min. Order. Experian was also dismissed after it settled with Kane. *See* ECF 27; ECF 49.

Standard Energy, TransUnion, and Equifax—but not GoodLeap—moved for judgment on the pleadings. *See* ECF 30; ECF 32. Kane sought leave to amend her complaint in response to Standard Energy's motion and opposed the credit reporting agencies' joint motion. ECF 36;

ECF 38; ECF 40. The Court granted Kane's request for leave to amend, thereby mooting Standard Energy's motion, and denied the credit reporting agencies' motion. *See* Aug. 18, 2023 Min. Orders. After that, Equifax and TransUnion settled with Kane and were both dismissed as defendants. *See* ECF 60; ECF 61. With only GoodLeap and Standard Energy left in the case, the parties proceeded through discovery and then filed three separate cross-motions for summary judgment. *See* ECF 85; ECF 86; ECF 101. In her motion, Kane asks the Court to enter partial summary judgment and to reserve the question of damages for trial. *See* ECF 101 at 17.

## II. LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011). "When parties file cross-motions for summary judgment, each motion is viewed separately, in the light most favorable to the non-moving party, with the court determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard." *Freedom Path, Inc. v. IRS*, 805 F. Supp. 3d 329, 343 (D.D.C. 2025).

## III. ANALYSIS

At this point, four claims are left in the case. Against GoodLeap, Kane alleges violations of the federal Fair Credit Reporting Act (FCRA) and Truth in Lending Act (TILA). *See* ECF 40-1 ¶¶ 90–105; *see also* ECF 101 at 9, 13 (Kane addressing only GoodLeap in summary judgment briefing on FCRA and TILA claims). Against both defendants, she alleges fraudulent concealment and violations of the D.C. Consumer Protection Procedures Act (CPPA). *See id.* ¶¶ 106–23. And against only Standard Energy she alleges negligence. *See id.* ¶¶ 124–31. The Court begins by

briefly addressing standing, before concluding that Kane is entitled to summary judgment against GoodLeap on one aspect of her FCRA claim—the question of Kane's injury and damages will be left for a jury—that the Court cannot yet resolve a portion of Kane's CPPA claim against Standard Energy, and that the companies are entitled to summary judgment on all other claims.

**A. Kane has standing to press most of her claims.**

Neither GoodLeap nor Standard Energy argue that Kane lacks Article III standing to bring her claims. But the Court has "an independent obligation to assure that standing exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Because it is undisputed that GoodLeap returned to Kane all of the payments it received, *see* ECF 101 at 7, and because GoodLeap argues Kane suffered no damages, *see* ECF 86-1 at 25–26, it is worth a brief detour to confirm that Kane has created a genuine dispute about her standing, *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("A plaintiff must demonstrate standing with the manner and degree of evidence required at the successive stages of the litigation."). With one exception, she has.

Start with the FCRA claims, through which Kane accuses GoodLeap of improperly obtaining her credit report and failing to properly investigate her disputes. *See infra* Section III.B (discussing the merits of these claims). In a declaration, Kane averred that engaging in the dispute process with GoodLeap caused her "severe stress on a daily basis," "much anxiety," "[d]emoraliz[ation]," and "depressi[on]." ECF 95-4 ¶¶ 33–36. GoodLeap protests that, despite this testimony, Kane "has generated no evidence" of emotional distress. ECF 103 at 9. But it is "beyond question" that Kane is "legally competent to give material testimony" as to her own emotional distress, and that it is "the role of the jury—not the court on summary judgment"—to determine whether she has, in fact, suffered such distress. *Johnson v. Perez*, 823 F.3d 701, 710 (D.C. Cir. 2016). And because there is a genuine dispute about whether Kane suffered emotional distress, there is a genuine dispute about whether she suffered a cognizable injury in fact that supports her

FCRA claims. As other courts in this district have explained, emotional distress counts as a cognizable injury in fact when it results from the kind of FCRA violations Kane alleges here. *See Henkel v. U.S. Dep't of Educ.*, No. 24-cv-1676, 2025 WL 2049267, at *3, *8–11 (D.D.C. July 22, 2025) (concluding so where plaintiff alleged emotional distress resulting from violation of 15 U.S.C. § 1681s-2(b)); *Robinson v. Upstart Holdings, Inc.*, No. 24-cv-1998, 2025 WL 2761234, at *2–3 (D.D.C. Sep. 29, 2025) (same for 15 U.S.C. § 1681b(f)). And a jury could conclude that Kane's emotional distress was caused by GoodLeap's challenged conduct—failing to adequately respond to Kane's complaint and unlawfully pulling her credit report in the first place, which led to the loan—and "would not have occurred . . . but for th[ose] challenged action[s]." *Henkel*, 2025 WL 2049267, at *12. "An award of damages would . . . likely redress" the injury, as well. *Id.* at *14.

The standing analysis for the TILA claims is even more straightforward. These claims turn on GoodLeap's alleged failure to provide Kane with required disclosures about the loan and to timely honor her request to rescind the loan. *See infra* Section III.C. Kane has produced evidence from which a jury could conclude that she was denied a different loan because of her loan from GoodLeap. *See* ECF 95-4 ¶¶ 9–11. That "sort of pocketbook injury is a prototypical form of injury in fact," *Collins v. Yellen*, 594 U.S. 220, 243 (2021), and a jury could find that it is fairly traceable to GoodLeap's alleged failure to provide loan disclosures because Kane would have terminated the loan immediately—prior to the August 2022 credit denial—had she received those disclosures. And although Kane did not request to rescind the loan until after the August 2022 credit denial, *see* ECF 95-4 ¶ 14, the emotional injury that resulted from Kane's struggle to terminate the loan supports this aspect of her TILA claim no different than the FCRA claim. *See Walters v. Fast AC,*

*LLC*, 60 F.4th 642, 648–49 (11th Cir. 2023) (recognizing plaintiff in TILA case has standing based on his "emotional distress").

There is, however, a quirk with the D.C. Consumer Protection Procedures Act claims. As the Court explains below, the CPPA theories that it can decipher from Kane's briefing turn on the defendants' failure to provide Kane with the installation and loan agreements, their failure to timely rescind those agreements, and Standard Energy having deceived Kane in the first place by telling her the solar panels were free. *See infra* Section III.D. The injuries a jury could find resulted from the first two of those theories are the same as the injuries that support the FCRA and TILA claims—emotional distress and monetary injuries that resulted from the difficulties Kane experienced in cancelling her loans, both of which would have been avoided had she received the agreements and had the defendants timely rescinded them. The last theory, however, is different. Kane says that Standard Energy falsely told her that the solar panels were free. But she adamantly maintains that, despite that allegedly false representation, she never agreed to have the panels installed. *See* ECF 85-2 at 138. It is not clear to the Court, then, how Kane was injured by that alleged misrepresentation about the price. *See Woodford v. Yazam Inc.*, No. 22-cv-3665, 2023 WL 8083975, at *5 (D.D.C. Nov. 21, 2023) (holding plaintiff who "ha[d] not alleged . . . she was misled by any of defendant's alleged misrepresentations" lacked standing). As the Court explains below, it will not yet dismiss this CPPA claim on this basis. The parties' briefing has left the Court ill-equipped to resolve this standing question at this stage. Instead, the Court will order Kane to file a supplemental brief addressing her standing if she still wishes to pursue this CPPA claim.

Kane has, however, adequately demonstrated her standing to bring each of her other claims.[7] In reaching that conclusion, the Court has, as it must, "assume[d] the merits" in Kane's

[7] As the Court explains below, Kane has abandoned her fraudulent concealment and negligence claims. *See infra* Section III.E. The Court therefore does not address her standing to press either of those counts of her complaint.

favor. *Waterkeeper All. v. EPA*, 853 F.3d 527, 533 (D.C. Cir. 2017). The Court turns now to assessing whether Kane can, in fact, prevail.

### B. Kane is entitled to summary judgment on one of her Fair Credit Reporting Act claims, and GoodLeap on the other.

"A credit report can determine everything from whether a person can secure a credit card, purchase a home, win a new job, or start a small business. Recognizing the importance of accuracy in credit reporting, Congress adopted the Fair Credit Reporting Act in 1970." *Dep't of Agric. Rural Dev. Hous. Serv. v. Kirtz*, 601 U.S. 42, 45 (2024). Kane alleges GoodLeap violated two of the FCRA's provisions. *See* ECF 101 at 9, 13. First, she claims that GoodLeap ran afoul of section 1681s-2(b), which "requires 'person[s]' who furnish information to consumer reporting agencies to investigate" and respond to "consumer complaints" in the manner prescribed by that section. *Kirtz*, 601 U.S. at 50 (quoting 15 U.S.C. § 1681s-2(b)); *see* ECF 101 at 9. Second, Kane claims that GoodLeap unlawfully "obtain[ed]" her credit report without a valid purpose, in violation of section 1681b(f). 15 U.S.C. § 1681b(f); *see* ECF 101 at 13. The FCRA provides Kane with a private right of action to seek redress for either negligent or willful violations of both those provisions. *See* 15 U.S.C. §§ 1681n, 1681o. Kane has shown that she is entitled to summary judgment on liability on the first claim—her damages must be determined by a jury—but GoodLeap is entitled to judgment on the second.

#### 1. GoodLeap failed to fulfill its statutory duties after it was notified by the credit reporting agencies of Kane's dispute.

In addition to the credit reporting agencies themselves, the FCRA regulates "those who furnish information to" those agencies. *Kirtz*, 601 U.S. at 46. If a consumer notifies a credit reporting agency that she is disputing an item of information on her credit report, the agency must notify the furnisher that provided the disputed information. *See* 15 U.S.C. § 1681i(a)(2)(A). The Act then requires the furnisher to take certain investigative steps. *See id.* § 1681s-2(b)(1). The

furnisher must "conduct an investigation with respect to the disputed information," "review all relevant information provided by the consumer reporting agency," and "report the results of the investigation to the consumer reporting agency" according to the standards outlined in section 1681s-2(b). *Id.* § 1681s-2(b)(1)(A)–(E). The statute sets a deadline for completion of these steps. The furnisher must "complete all investigations, reviews, and reports required" within 30 days of the credit reporting agency's receipt of the complaint. *Id.* § 1681s-2(b)(2); *see id.* § 1681i(a)(1).

It is undisputed that Kane filed multiple disputes with the credit reporting agencies and that those agencies notified GoodLeap about the disputes. *See* ECF 86-1 at 12; ECF 101 at 7. Kane argues that GoodLeap failed to fulfill the obligations that were triggered once it received those notifications. She says that GoodLeap "did not conduct any investigation," should have but did not report back to the agencies that it "could not conclusively verify the disputed information," "did not verify the account was accurate with[in] 30 days of receiving" notice and therefore should have "modif[ied] or delete[d] the account," and, finally, should have "mark[ed] [the] account as disputed." ECF 101 at 10–12. GoodLeap, of course, says the opposite: that it is undisputed that the company "conducted a full investigation" and then "reported back to the [credit reporting agencies] and deleted the trade line." ECF 86-1 at 15–16.

Kane is partially correct. There is no dispute that GoodLeap did not "complete all investigations, reviews, and reports required" within the "[d]eadline" set by the statute. 15 U.S.C. § 1681s-2(b)(2). GoodLeap received the first two dispute notices on October 19, 2022. *See* ECF 86-1 at 12 (GoodLeap discussing when it received disputes); ECF 101 at 7; ECF 96-3 at 13. That triggered GoodLeap's obligation to "report the results of [its] investigation to the consumer reporting agency" within 30 days of that agency receiving the dispute. 15 U.S.C. § 1681s-2(b)(1)(C), (b)(2); *id.* § 1681i(a)(1). But as GoodLeap readily acknowledges,

the company did not "report[] back to the" credit reporting agencies until "[i]n or around March 2023." ECF 86-1 at 12; *see also id.* at 16 ("Once the investigation was concluded, in March 2023, GoodLeap reported back to the [credit reporting agencies]."). Because GoodLeap far exceeded its deadline for "report[ing] the results" of its investigation, 15 U.S.C. § 1681s-2(b)(1)(C), Kane is entitled to judgment as a matter of law on this aspect of her FCRA claim.

That conclusion renders it unnecessary to decide whether GoodLeap also violated the statute by failing to either (1) report back at the 30-day point that it could not "conclusively verify the information was accurate," (2) "modify or delete the account" at that stage, or (3) "mark [the] account as disputed." ECF 101 at 10–12. All of those claims are downstream of GoodLeap's failure to timely "report the results of the investigation." 15 U.S.C. § 1681s-2(b)(1)(C). They relate to what GoodLeap should have said when it did the mandatory reporting within the required time. Because GoodLeap failed altogether to report back within the required time, there is no need to further decide what the company should have said had it done the necessary reporting.[8]

Kane's claim that GoodLeap failed altogether to "conduct an investigation with respect to the disputed information," on the other hand, stands separate and apart from her timing claim. 15 U.S.C. § 1681s-2(b)(1)(A); *see* ECF 101 at 10 (discussing this claim). That GoodLeap did not report back to the credit reporting agencies by the deadline does not necessarily mean the company failed to "conduct any investigation." ECF 101 at 10 (arguing there was no investigation).

Unlike the timing claim, this claim fails as a matter of law. Kane does not argue that GoodLeap investigated but failed to do so in a "reasonable" manner. *Haynes v. Navy Fed. Credit*

---

[8] GoodLeap did, of course, eventually report the results of its investigation, informing the credit reporting agencies that it had "deleted the trade line." ECF 86-1 at 12; ECF 96-3 at 15. Kane does not argue that any aspect of that reporting was unlawful because of its content—for instance, that GoodLeap should at that point have merely marked the information as not "conclusively verifi[ed]." ECF 101 at 10. That confirms that these claims all relate to what GoodLeap should have done at the 30-day mark and are therefore downstream of Kane's successful claim that GoodLeap failed to comply with the statutory deadline.

*Union*, 52 F. Supp. 3d 13, 19 (D.D.C. 2014) (discussing "objective" reasonableness standard used to assess furnisher's investigation). Instead, Kane argues only that GoodLeap "did not conduct *any* investigation." ECF 101 at 10 (emphasis added). That is undisputably not true. As Kane herself acknowledges, after she complained directly to GoodLeap the company "began an investigation into the opening" of her loan. ECF 101 at 6. A manager from the client support department led that investigation, and as part of her work she spoke with Phyllis and Standard Energy. *See* ECF 87-2 at 5–6; ECF 101 at 6; ECF 86-15 (transcript of call with Phyllis). When GoodLeap received notification from the credit reporting agencies that Kane had filed disputes with them, GoodLeap allowed the ongoing "open investigation" to continue, treating it as the investigation into the credit reporting agency disputes, as well. ECF 96-3 at 14; *see also* ECF 86-1 (GoodLeap describing a single investigation led by the client support manager); ECF 101 at 7. Kane has not explained why that ongoing investigation fails to constitute "an investigation," 15 U.S.C. § 1681s-2(b)(1)(A), and the Court sees no reason to interpret the statute in that odd way.

Perhaps GoodLeap's choice to rely on the ongoing investigation into Kane's direct complaint as a response to the disputes from the credit reporting agencies was not an objectively reasonable strategy. *See Potapova v. Toyota Motor Credit Corp.*, No. 23-cv-571, 2024 WL 4026216, at *2 (S.D.N.Y. Sep. 3, 2024) (explaining that jury could conclude investigation was not objectively reasonable where furnisher relied only on "separate" investigation that resulted from a "direct complaint" and no one involved with "latter investigations" into credit reporting agency dispute "even knew about" the "direct complaint" investigation). But Kane has not made that claim or pointed to any evidence rebutting Goodleap's assertion that it conducted a fulsome investigation, including of the disputes raised with the credit reporting agencies, ECF 86-1 at 11–12, 16, instead arguing only that GoodLeap did not conduct any investigation at all. Because it is

undisputed that GoodLeap did investigate Kane's dispute, GoodLeap is entitled to summary judgment on this aspect of Kane's section 1681s-2(b) claim.

As for Kane's successful FCRA claim, there is still the question of damages. Kane did not move for summary judgment on that issue. *See* ECF 101 at 17 (asking Court to "reserve trial only for the question of damages"). GoodLeap, however, did move for judgment in its favor on the ground that no jury could find Kane suffered damages. *See* ECF 86 at 25. The Court already explained why that's wrong in addressing Kane's standing. *See supra* 9–10. If a jury concludes Kane suffered emotional distress, that injury is compensable under the FCRA as an aspect of her "actual damages." 15 U.S.C. §§ 1681n(a)(1)(A), 1681o(a)(1); *see, e.g.*, *Llewellyn v. Allstate Home Loans, Inc.*, 711 F.3d 1173, 1183 (10th Cir. 2013). And whether Kane will be limited to "actual damages"—as would be the case if she can only prove GoodLeap was "negligent" in missing its deadline—or instead is eligible for "actual damages, or statutory damages ranging from $100 to $1,000, and even punitive damages"—as would be true if she proves a "willful" violation—is a question for a jury. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007); 15 U.S.C. §§ 1681n, 1681o; *see also, e.g.*, *Seamans v. Temple Univ.*, 744 F.3d 853, 868 (3d Cir. 2014) (discussing jury's role in determining this damages question).

Finally, contrary to GoodLeap's insistence, there is a dispute about whether Kane is entitled to punitive damages. To recover punitive damages, Kane must prove GoodLeap's violation was "willful[]." 15 U.S.C. § 1681n(a). That means GoodLeap committed either a "knowing" or "reckless" violation of the statute. *Safeco Ins. Co. of Am.*, 551 U.S. at 57–59. A jury could, at the very least, find that the company's failure to timely report back to the credit reporting agencies created an "unjustifiably high risk" of violating the statute—given its crystal clear imposition of the deadline, *see* 15 U.S.C. § 1681s-2(b)(2)—and was therefore reckless. *Safeco Ins. Co. of Am.*,

551 U.S. at 68; *see, e.g.*, *Seamans*, 744 F.3d at 868–69 (explaining that fact the furnisher's conduct was "foreclosed by the straightforward statutory text" could support "a jury finding of willfulness"). As for the section 1681s-2(b) timing claim to which Kane is entitled to summary judgment, a jury will have to determine the damages.

**2. GoodLeap had a permissible purpose for obtaining Kane's credit report.**

Kane claims GoodLeap also violated the FCRA when it pulled her credit report in April 2021. *See* ECF 101 at 13. GoodLeap is entitled to summary judgment on that claim. One of the "purpose[s] for which [a] consumer report is authorized to be furnished" is where the person requesting the report "intends to use [it] in connection with a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to . . . the consumer." 15 U.S.C. § 1681b(a)(3)(A), (f)(1). GoodLeap requested Kane's credit report "in connection with," *id.* § 1681b(a)(3)(A), an application submitted on Kane's behalf for a loan to fund the solar panel purchase, *see* ECF 86-4 at 31 (Phyllis acknowledging she gave her mom's information "to GoodLeap and to the solar companies" when agreeing to purchase the panels and fund that purchase with the loan).

It is true, as Kane points out, that Phyllis did not sign the loan agreement on Kane's behalf until after GoodLeap pulled the credit reports. *See* ECF 101 at 13. But one of GoodLeap's corporate designees explained in uncontroverted testimony that the company receives loan applications prior to approving loans. *See* ECF 87-1 at 6. When Phyllis executed the installation contract, that set in motion the loan application process and led GoodLeap to request Kane's credit report "in connection with a credit transaction . . . involving the extension of credit to" Kane. 15 U.S.C. § 1681b(a)(3)(A). Unsurprisingly, GoodLeap did not wait until after it approved the loan and entered into the loan agreement to check Kane's credit.

It is also true, as Kane says, that there is no loan application in the record. *See* ECF 108 at 10. But the installation agreement is in the record, and it shows that Phyllis signed that document (again, with Kane's name) on April 10, 2021. *See* ECF 85-2 at 60. GoodLeap pulled Kane's credit report that same day. *See* ECF 95-4 ¶ 30. And GoodLeap's corporate representatives explained the relationship between an installation contract and a loan application. The contractor selling solar panels (in this case, National Solar Energy Corporation as Standard Energy's sales representative) "talks to the consumer about a home improvement project" and, "[i]f that consumer is interested in learning about what financing options may be available to them, the contractor . . . introduce[s] them to [GoodLeap's] website, which they could then [use to] apply for a loan." ECF 87-1 at 5. GoodLeap's authorization to pull Kane's credit report came via this "application process," which was "conducted by the sales representative." ECF 96-1 at 8. And Phyllis confirmed that at the time she was signing the installation agreement, she was aware that she was applying for a loan in connection with the purchase. *See* ECF 86-4 at 16–17.

So even though there is no loan application in the record, the only plausible inference from this uncontroverted evidence is that GoodLeap was notified on April 10, 2021, that Kane (perhaps without her knowledge, but GoodLeap had no way of knowing that) had entered into an agreement to purchase solar panels and applied for a loan from GoodLeap to fund that purchase. That's why GoodLeap pulled Kane's credit report. The competing inference that Kane asks the Court to draw—that GoodLeap pulled Kane's credit report on April 10 without any prompting and for no reason at all—is fanciful. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596 (1986) ("[T]he absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists.").

### C. GoodLeap is entitled to summary judgment on the TILA claims.

Kane's next claims against GoodLeap arise under the Truth in Lending Act. *See* ECF 101 at 13–15. "Congress passed TILA to promote consumers' 'informed use of credit' by requiring 'meaningful disclosure of credit terms.'" *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198 (2011). To that end, the Act and its implementing regulations require creditors to provide certain information to consumers. *See* 15 U.S.C. § 1631; 12 C.F.R. §§ 1026.5, 1026.17. In cases where a creditor is obtaining a security interest "in a consumer's principal dwelling," TILA also provides a right to rescind the transaction. 12 C.F.R. §§ 1026.15(a)(1)(i), 1026.23(a)(1).[9] Kane claims GoodLeap ran afoul of these rules in two ways. First, the company never provided her with the required disclosures. *See* ECF 101 at 15. Second, GoodLeap failed to timely honor her request to rescind the loan. *See id.*

Both of those claims fail for essentially the same reason. Viewing the record in the light most favorable to Kane, Phyllis signed the loan agreement on Kane's behalf without Kane's knowledge and gave GoodLeap an email address that Phyllis said was Kane's but that was not, in fact, Kane's email address. *See* ECF 86-7 at 3, 6; ECF 95-3 at 36. The loan agreement included a "Truth in Lending Disclosure Statement" as well as a "Notice Of Right To Cancel." ECF 86-7 at 4, 16. GoodLeap sent the agreement, including those disclosure documents, to the email address it had for Kane. *See* ECF 86-8 at 2. Using that email address, someone purporting to be Kane signed the documents. *See id.* And then, after the agreement was executed, GoodLeap sent a welcome letter that included another copy of the "Truth in Lending Disclosure Statement" to that same email address. ECF 86-9 at 3–4 (sent to "pekan1432@gmail.com").

[9] The implementing regulations have different rules for "open-end credit" and "closed-end credit." *Compare* 12 C.F.R. § 1026.15, *with id.* § 1026.23; *see also id.* § 1026.2(10), (20) (definitions). Neither party has addressed which kind of credit transaction is at issue. The difference between the two forms makes no difference here, and the Court cites the parallel regulations addressing each kind of credit to confirm that the relevant rules are applicable to each.

Even if the "exact contours of [Kane's] contractual obligations to" GoodLeap are "somewhat unclear"—viewed most favorably to Kane, perhaps she is not bound because she did not assent and Phyllis lacked apparent authority to bind her—"nothing in TILA would seem to require [GoodLeap] to investigate the legitimacy of an [email] address provided in an application." *MacDermid v. Discover Fin. Servs.*, 488 F.3d 721, 734 (6th Cir. 2007) (emphasis removed). And because TILA requires disclosure only "to the person who is obligated," 15 U.S.C. § 1631(a), to the extent the loan agreement was "forged" and "created no obligation" for Kane—Kane repeatedly characterizes it as "fraudulent," *e.g.*, ECF 101 at 5—TILA did not require GoodLeap to disclose anything to Kane. *Jensen v. Ray Kim Ford, Inc.*, 920 F.2d 3, 4 (7th Cir. 1990). For this reason, "courts routinely dismiss TILA claims where plaintiffs allege the challenged credit agreement was forged or falsified." *Migliore v. Seibert*, No. 23-cv-2623, 2024 WL 1327947, at *9 (D.N.J. Mar. 28, 2024). And the same reasoning dooms Kane's rescission claim, as well. The right of rescission under the statute extends only to an "obligor." 15 U.S.C. § 1635(a).

None of this is to say that there is no remedy for those who are fraudulently entered into credit agreements. One can imagine claims that run against the creditor and, assuming the creditor is not the party that committed the fraud, the fraudster as well. "That remedy, however, is not provided in TILA." *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1373 (S.D. Fla. 2009). Because Kane's claims are all premised on her not having been a party to the loan agreement or having had any knowledge of its terms, GoodLeap is entitled to summary judgment on the TILA claims.

**D. GoodLeap is entitled to summary judgment on the CPPA claim, but the Court cannot yet resolve the CPPA claim against Standard Energy.**

Kane next alleges that both GoodLeap and Standard Energy violated the D.C. Consumer Protection Procedures Act. Although Kane purports to have moved for summary judgment as to liability on all of her claims, "reserv[ing] trial only for the question of damages," her discussion

of the CPPA claim is irreconcilable with that request. ECF 101 at 17. Of the CPPA claim, she says it "must be tried by a jury or trier of fact," and she claims to have identified several "genuine issue[s] of fact." *Id.* at 16 (alterations omitted). "That assertion, of course, squarely contradicts [Kane's] request for summary judgment" on the CPPA claim. *Pinney v. Isaacman*, No. 19-cv-2259, 2026 WL 622255, at *7 (D.D.C. Mar. 5, 2026); *see* Fed. R. Civ. P. 56(a). The Court therefore considers only whether Kane has done enough to defeat Standard Energy's and GoodLeap's motions for summary judgment on these claims.

Kane's briefing about her CPPA claim is, put generously, sparse. She devoted five sentences of her motion to explaining her CPPA claim. *See* ECF 101 at 16. The remaining paragraph in that section of Kane's brief was used to disavow aspects of the CPPA claim from her complaint. Although Kane claims there are "genuine issue[s] of fact," *id.*, she fails to connect these factual issues to any of the enumerated "unfair or deceptive" practices listed in the D.C. Code, D.C. Code § 28-3904, or to otherwise explain how that statute addresses the relevant facts. Nevertheless, the Court can discern three CPPA theories from Kane's briefing. The first two of those fail. As alluded to above when addressing Kane's standing, the Court is not yet in a position to rule on the third. That theory, however, only implicates Standard Energy, so GoodLeap is entitled to summary judgment across the board on the CPPA claims.

The first of Kane's theories is that Standard Energy and GoodLeap violated the CPPA by "fail[ing] to provide [Kane] with contract agreements and loan disclosures." ECR 101 at 16. Kane did not cite it in her opening brief (she belatedly got there in her reply), but a provision of the CPPA makes it an "unfair or deceptive trade practice" to "fail to supply to a consumer a copy of a sales or service contract, lease, promissory note, trust agreement, or other evidence of indebtedness." D.C. Code § 28-3904(q); *see* ECF 108 at 14 n.11. In their motions for summary

judgment, Standard Energy and GoodLeap both argued this claim fails because to the extent Kane did not "receive[] a copy of" the agreements, "it was not because" they "failed to provide" them, "but rather because [Phyllis] failed to provide her mother with a copy." ECF 85-1 at 11; *see* ECF 86-1 at 20–21 (arguing same). In her response, Kane completely failed to respond to that argument and explain how, despite sending the agreements to the email address Phyllis told them belonged to Kane, the defendants violated the CPPA. *See* ECF 101 at 16. And although Kane had a bit more to say on this front about agency law in her reply, that response both came too late and failed to respond to the argument Standard Energy and GoodLeap made. *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("Issues may not be raised for the first time in a reply brief."). It is not the Court's role to develop this claim for Kane. *See Clark v. Sweeney*, 607 U.S. 7, 9 (2025) ("To put it plainly, courts call balls and strikes; they don't get a turn at bat."). Because Standard Energy and GoodLeap moved for judgment on the ground that it was undisputed that Phyllis received the agreements and disclosures and Kane failed to explain in response how her claim could proceed despite that undisputed fact, or to suggest there was a material dispute related to that fact, the Court grants summary judgment on this aspect of the CPPA claim.

The second CPPA theory the Court can at least venture a guess at is that GoodLeap and Standard Energy violated the Act when they "failed to honor [Kane's] notice of cancellation." ECF 101 at 16. The only source of the right to cancellation that Kane has identified is the right to rescission provided by the Truth in Lending Act, so the Court assumes that Kane's theory here is that it is an unfair trade practice to violate that other statute. And it is true that the "CPPA allows actions challenging 'a trade practice in violation of a law of the District.'" *Jones v. Vintage Equity Grp., LLC*, No. 24-cv-3108, 2025 WL 2105574, at *7 (D.D.C. July 28, 2025) (citing D.C. Code § 28-3905(k)(1)(A)). But the Truth in Lending Act is a federal law, and the CPPA's "broad

language does not include violations of federal law." *Id.* That puts an end to this aspect of the CPPA claim.

The third theory is that Standard Energy made a material misrepresentation to Kane—via its agent, the salesperson—when it told her the solar system would be free. *See* ECF 101 at 16. Kane raised this theory in her complaint and outlined it—in only the vaguest of terms—in her motion for summary judgment. *See id.*; ECF 40-1 ¶ 110(l). As discussed above, the Court has doubts about Kane's standing to press this theory. *See supra* 11. That said, because neither party addressed standing, and because Kane has barely fleshed out this theory of CPPA liability, the Court is not in a position to determine at this stage whether Kane has Article III standing to press this claim. If Kane wishes to proceed with this CPPA claim, she must file a supplemental brief explaining precisely how Standard Energy violated the Act by telling her the solar system would be free and why she has Article III standing to seek redress on that theory of liability. Because this aspect of Kane's CPPA claim only pertains to Standard Energy's conduct, the Court does grant GoodLeap's motion on the CPPA claim in full. *See* ECF 101 at 16 (claiming there is a "genuine issue of fact as to whether" Standard Energy's "agent . . . falsely represented that the solar system would be free").[10]

### E. Standard Energy and GoodLeap are entitled to summary judgment on the fraudulent concealment and negligence claims.

In her complaint, Kane also brought claims for fraudulent concealment (against both GoodLeap and Standard Energy) and negligence (against only Standard Energy). *See* ECF 40-1 ¶¶ 117–31. The defendants moved for summary judgment on those claims. *See* ECF 85-1 at 14–

[10] In her motion Kane also alludes in two sentences—without a single citation—to a supposed genuine dispute about whether the defendants "continued to enforce the contracts after they knew the contracts were not enforceable" and whether the defendants "targeted" Kane "with an unfeasible solar system because of her age." ECF 101 at 16. That is both insufficient to create a genuine dispute of fact and to "frame" any would-be legal "issue[]" for this Court's "decision." *Clark*, 607 U.S. at 9; *see Grimes v. District of Columbia*, 794 F.3d 83, 94–95 (D.C. Cir. 2015) (describing opposing party's burden at summary judgment).

16; ECF 86-1 at 23–25. In her opposition and cross-motion, Kane did not say a word about these claims. *See generally* ECF 101. "By declining to pursue" these claims in her "summary judgment briefing, [Kane] has abandoned" them. *Nat'l Council of Agric. Emps. v. U.S. Dep't of Lab.*, No. 22-cv-3569, 2024 WL 324235 at *5 n.3 (D.D.C. Jan. 29, 2024); *see also Mosleh v. Howard Univ.*, No. 19-cv-339, 2022 WL 898860 at *15 n.6 (D.D.C. Mar. 28, 2022) (explaining why "the failure to oppose a basis for summary judgment constitutes [a] waiver"). For good measure, the Court notes that it is satisfied based on Standard Energy's and GoodLeap's briefing that, given the undisputed facts the defendants identify and that Kane fails to rebut, both are entitled to judgment as a matter of law on these claims. The Court therefore grants summary judgment to the defendants on the fraudulent concealment and negligence claims.

* * *

Each of the summary judgment motions, ECF 85; ECF 86; ECF 101, are **GRANTED in part** and **DENIED in part**.

**SO ORDERED.**

JIA M. COBB
United States District Judge

Date: August 12, 2026